# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00715-COA

**LARRY POINTER AND SHIRLEY POINTER**                    **APPELLANTS**

**v.**

**RITE AID HEADQUARTERS CORP., K&B**                    **APPELLEES**
**MISSISSIPPI CORPORATION, AND HETAL**
**PATEL**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/29/2020 |
| TRIAL JUDGE: | HON. JAMES McCLURE III |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | ERIC JOSEPH LEWELLYN |
| ATTORNEY FOR APPELLEES: | TIMOTHY DALE CRAWLEY |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 06/01/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLTON, P.J., LAWRENCE AND SMITH, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     The DeSoto County Circuit Court entered an order granting summary judgment in favor of Rite Aid Headquarters Corp., K&B Mississippi Corporation, and Hetal Patel (collectively, the Appellees).  In its order, the trial court found no material facts in dispute and accordingly dismissed Larry and Shirley Pointer's claims against the Appellees for defamation, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence.

¶2.     The Pointers now appeal, asserting the following assignments of error: (1) the trial court erred in finding that Patel's statements to law enforcement were privileged, and (2) the

trial court erred in concluding that no genuine issues of material fact existed, thus warranting summary judgment.

¶3. After our review, we find no error. We therefore affirm the trial court's grant of summary judgment in favor of the Appellees.

**FACTS**

¶4. On May 19, 2016, Larry Pointer presented a prescription for a controlled substance to pharmacist Hetal Patel at the Rite Aid pharmacy[1] in Southaven, Mississippi. Upon following Rite Aid's policies for verifying prescriptions for a controlled substance, Patel determined that the prescription was suspicious. In light of her suspicions, Patel contacted local law enforcement authorities and reported the suspicious and potentially fraudulent prescription. Two officers with the Southaven Police Department responded to Patel's call. The officers took Larry and his wife, Shirley, into custody.[2] Upon further investigation, Larry and Shirley were released.

¶5. On October 6, 2016, the Pointers filed a complaint against the Appellees asserting claims for defamation, intentional infliction of emotion distress, negligent infliction of

---

[1] The record reflects that K&B Mississippi Corporation was purchased by Rite Aid in 1997, and Rite Aid owns the name "K&B." The pharmacy at issue was owned, operated, and controlled by K&B and/or Rite Aid.

[2] Officer Brett Yoakum of the Southaven Police Department was dispatched to Rite Aid in response to Patel's call. In his deposition, Officer Yoakum clarified that Larry and Shirley were never arrested; rather, they were detained for investigative purposes.

emotional distress, and negligence.[3]

¶6.     On March 10, 2020, the Appellees filed a motion for summary judgment asserting that no genuine issue of material fact existed and that, as a result, the Appellees were entitled to prevail as a matter of law.  The Appellees argued that the Pointers could not meet their burden of proof as to any of their alleged claims.  The Appellees attached the following documents in support of their motion:  an itemization of undisputed material facts; their memorandum brief in support of their motion; the Pointers' original complaint, amended complaint, and second amended complaint; excerpts of the deposition testimony of Hetal Patel and Dr. Parvinchandra Patel, the doctor who wrote the prescription at issue; a Mississippi Prescription Management Program printout concerning Larry; and a Tennessee Prescription Management Program printout concerning Larry.

¶7.     On June 24, 2020, five days before the summary judgment hearing, the Pointers filed their response in opposition to summary judgment.  On June 24 and June 25, 2020, the Pointers also filed the following with the trial court: a Mississippi Rule of Civil Procedure 30(b)(6) deposition transcript of K&B Mississippi Corporation's corporate representatives; a deposition transcript of Officer Brett Yoakum; a deposition transcript of Larry; a deposition

---

[3] The Pointers filed their first complaint against "Rite Aid Headquarters Corp. and John Does 1-10."  The record shows that Rite Aid removed the case to federal court.  The Pointers subsequently filed an amended complaint naming K&B Mississippi Corporation and Patel as additional defendants.  The joinder of K&B, a Mississippi corporation, required a remand of the case back to state court.  The Pointers then filed their second amended complaint to name the City of Southaven as a defendant.  The record reflects that the Pointers later voluntarily dismissed the City of Southaven from the case.

transcript of Dr. Patel; and a deposition transcript of Hetal Patel.

¶8. After the hearing on June 29, 2020, the trial court entered an order granting summary judgment in favor of the Appellees. The trial court held that because the Pointers failed to sustain their burden of production as to the necessary elements for their claims of defamation, intentional infliction of emotional distress, negligence, or negligent infliction of emotional distress, "there are no genuine issues of material fact, and [the] Defendants are entitled to judgment as a matter of law."

¶9. The Pointers now appeal from the trial court's order granting summary judgment.

**DISCUSSION**

¶10. On appeal, the Pointers argue that the trial court erred in finding that Hetal Patel's (hereafter "Patel") statements to law enforcement regarding Larry's prescription were privileged, and the trial court therefore erred in concluding that no genuine issues of material fact existed. Because the determination of whether Patel's statements to law enforcement were privileged affects whether summary judgment was appropriate as to the Pointers' claim of defamation, we will combine these issues.

¶11. This Court applies a de novo standard when reviewing a trial court's grant of a motion for summary judgment. *Venture Inc. v. Harris*, 307 So. 3d 427, 431 (¶14) (Miss. 2020). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact and that the moving party is entitled to a judgment as

4

a matter of law.'" *Id*. at 431-32 (¶14) (quoting M.R.C.P. 56(c)).

¶12.   The reviewing court must view the evidence "in the light most favorable to the party against whom the motion has been made.  If, in this view, the moving party is entitled to judgment as a matter of law, summary judgment should be entered in his favor.  Otherwise, the motion should be denied." *Id*. at 432 (¶15).   The movant "bears the burden of demonstrating that no genuine issue of material fact exists." *Id*.  The supreme court has stated that "the court cannot try issues of fact on a Rule 56 motion; it may only determine whether there are issues to be tried." *Id*. (quoting *Evan Johnson & Sons Constr. Inc. v. State*, 877 So. 2d 360, 365 (¶17) (Miss. 2004)).

### A.   Defamation

¶13.   In the present case, the trial court granted summary judgment as to the Pointers' claim for defamation after finding that the Pointers failed to meet their burden of production that Patel's statements to law enforcement were not privileged and that Patel acted in bad faith. The trial court found that Patel, as a pharmacist, had a duty pursuant to the Mississippi Pharmacy Practice Act, Mississippi Code Annotated section 73-21-127 (Supp. 2014), to check a patient's prior prescriptions before filling a prescription for a controlled substance. The trial court further held that regardless of whether Patel's statement that Larry possessed a fraudulent prescription was false, Patel "appeared to act in good faith by reporting what they call a suspicious prescription to law enforcement."

¶14.   On appeal, the Pointers argue that the trial court erred in determining that Patel's

5

statements to law enforcement regarding Larry were made in good faith and therefore privileged. The Pointers assert that even though Patel knew that Dr. Patel wrote the prescription, Patel still made a false allegation by telling the police that Larry forged the prescription. The Pointers claim that Patel did not act in good faith because she admitted that she knew Dr. Patel wrote Larry's prescription before she contacted the police.

¶15. The Appellees, however, maintain that Patel never informed police officers that Larry's prescription was forged; rather, Patel informed police officers that Larry possessed a *fraudulent* prescription. Patel admitted she knew that Dr. Patel actually wrote the prescription for Larry. However, upon following the procedure for verifying a prescription for a controlled substance, Patel discovered that Larry had received multiple prescriptions for the same controlled substance from two different doctors during approximately the same time period.[4] Furthermore, Dr. Patel's nurse instructed Patel not to fill Larry's prescription.

¶16. To prevail on their claim of defamation, the Pointers bear the burden of proving the

---

[4] Mississippi Code Annotated section 41-29-144(1) (Rev. 2013) provides that "[i]t is unlawful for any person knowingly or intentionally to acquire or obtain possession or attempt to acquire or obtain possession of a controlled substance . . . by misrepresentation, fraud, forgery, deception or subterfuge." In an official opinion, the Mississippi Attorney General addressed whether a person violates section 41-29-144 when they obtain controlled substances from multiple physicians in multiple states and use multiple pharmacies in having the prescriptions filled. Miss. Att'y Gen. Op. 2007-00648, 2007 WL 852281, *Palmer* (Jan. 19, 2007). The opinion provides that such determination "is a mixed question of law and fact that must be determined by a court of competent jurisdiction based upon the facts presented in each particular case," and the opinion explains that the trial court "would have to determine whether a person is guilty of misrepresentation, fraud, deception or subterfuge in violation of the section, by failing to advise a physician that he is receiving other pain prescriptions from other physicians." *Id*.

following elements:

> (a)     A false statement that has the capacity to injure the plaintiff's reputation;
>
> (b)     An unprivileged publication, i.e., communication to a third party;
>
> (c)     Negligence or greater fault on [the] part of [the] publisher; and
>
> (d)     "Either actionability of the statement irrespective of special harm or the existence of special harm caused by publication."

*Rainer v. Wal-Mart Assocs. Inc.*, 119 So. 3d 398, 403 (¶16) (Miss. Ct. App. 2013) (quoting *Speed v. Scott*, 787 So. 2d 626, 631 (¶21) (Miss. 2001)). The supreme court has explained that "[w]hen analyzing defamation claims, Mississippi courts employ a bifurcated process." *Barmada v. Pridjian*, 989 So. 2d 359, 362 (¶9) (Miss. 2008). The trial court must first "determine whether the occasion calls for a qualified privilege." *Id*. If the court finds that "a qualified privilege does exist, the [c]ourt must then determine whether the privilege is overcome by malice, bad faith, or abuse." *Id*. The Pointers, as the plaintiffs, bear the burden of proof in showing that the communication at issue was not privileged. *Ranier*, 119 So. 3d at 403 (¶16).

¶17.     In determining whether Patel's statements to law enforcement were privileged, we recognize that the supreme court has defined qualified privilege as

> a communication made in good faith and on a subject matter in which the person making it has an interest, or in reference to which he has a duty, is privileged if made to a person or persons having a corresponding interest or duty, even though it contains matter which without this privilege would be slanderous.

7

*Barmada*, 989 So. 2d at 362 (¶9). Additionally, "communications which would otherwise be defamatory are protected as privileged if they are made in good faith in the prosecution of any inquiry regarding a crime which has been committed." *Bester ex rel. Bester v. Clark*, 963 So. 2d 1190, 1192 (¶10) (Miss. Ct. App. 2007) (quoting *Downtown Grill Inc. v. Connell*, 721 So. 2d 1113, 1117 (¶8) (Miss. 1998)). "A citizen has a privilege to start the criminal law into action by complaints to the proper officials so long as one acts either in good faith, i.e., for a legitimate purpose, or with reasonable grounds to believe that the person proceeded against may be guilty of the offense charged." *Id*. "When a citizen 'merely states what is believed' to prosecuting authorities and leaves 'the decision to prosecute entirely to the uncontrolled discretion of the officer' then the citizen has not instigated a criminal proceeding." *Id*. In the present case, the Appellees argue that because Patel communicated the facts learned in her investigation to the police in good faith for the purposes of reporting a crime, her statements were privileged.

¶18. In her deposition, Patel testified that when Larry brought his prescription to the Rite Aid pharmacy, she went through the policies set forth by Rite Aid for verifying prescriptions for controlled substances.[5] Patel explained these policies required that she verify Larry's

---

[5] The record contains the Rite Aid handbook outlining the company's policies and procedures. The handbook sets forth the following procedures for validating and dispensing high alert controlled substances:

> For high alert controlled substances . . . this validation process should be completed by following these 6 steps when the patient or prescription appears suspicious.

identification, the address on his identification, and the address on the prescription. Patel was also required to check the Prescription Management Program (PMP) database for controlled substances, as well as the Rite Aid database, and to call the prescribing doctor to verify the prescription.

¶19. Patel stated that the first red flag she observed was that the address on Larry's identification was different than the address on the prescription. Patel testified that she asked Larry about it, and he informed Patel that he had recently moved. Patel also testified that when she checked the PMP database for both Mississippi and Tennessee, she observed that Larry had recently received two prescriptions for the same controlled substance. The PMP also showed that Larry was driving to different pharmacies to fill the prescriptions. Patel explained that the fact that Larry had obtained two prescriptions for the same medication raised another red flag for her. Patel further testified that other circumstances surrounding Larry's prescription raised additional red flags: Larry wanted to pay out of pocket; the Rite Aid database showed that Larry had recently filled a prescription for the same controlled

---

| Step 1: | Receive Prescription |
|---|---|
| Step 2: | Validate Prescription |
| Step 3: | Validate Prescriber |
| Step 4: | Validate Patient |
| Step 5: | Determine, Using Professional Judgment, Whether to Dispense or Not to Dispense the Prescription |
| Step 6: | Report Suspicious Activity (if applicable). |

As to Step 6, the handbook states the following: "Contact local authorities for any prescription that has been confirmed by the prescriber as fraudulent or forged."

substance at another Rite Aid location; the prescription was not written on a watermark paper but rather on regular printer paper; and the signature on the prescription looked abnormal when compared to other prescriptions in the Rite Aid database written by the same doctor.

¶20.    Patel testified that she then personally called Dr. Patel, the doctor who allegedly wrote Larry's prescription.  Patel stated that the receptionist transferred her to Dr. Patel's nurse. Dr. Patel's nurse confirmed that Dr. Patel did write the prescription at issue.  However, the nurse informed Patel that Larry "was required to fill any prescription Dr. Patel writes at the pharmacy that's right next door" to Dr. Patel's office.  According to Patel, Dr. Patel's nurse stated that Larry "cannot fill any prescription in any other pharmacy," otherwise "it makes it not a legitimate prescription."

¶21.    Patel testified that she then inquired with the nurse as to whether Dr. Patel checked PMPs prior to issuing prescriptions.  Dr. Patel's nurse admitted to Patel that the doctor "doesn't do it all the time."  Patel stated that she insisted on speaking to Dr. Patel to advise him that he needed check PMPs prior to issuing prescriptions, so the nurse transferred her to him.  Patel stated that Dr. Patel seemed "rushed and not interested in giving any information."  Patel admitted that Dr. Patel informed her that he wrote Larry's prescription. Patel also stated that Dr. Patel told her that he was not required to check PMPs prior to issuing prescriptions.

¶22.    Dr. Patel transferred Patel back to the nurse. Patel stated that at that time, the nurse instructed her not to fill Larry's prescription due to Larry's agreement with Dr. Patel that he

would only fill his prescriptions from Dr. Patel at the pharmacy next door to Dr. Patel's office. Patel testified that the nurse informed her that filling the prescription at any other pharmacy would invalidate the prescription.

¶23. Regarding her decision to contact law enforcement regarding Larry, Patel explained that she made that decision "after [she] saw that history in the PMPs that he was traveling so far with these prescriptions from different doctors and paying . . . out of pocket. And that kind of alerts [you] . . . that he may be overdosing or abusing it."

¶24. Officer Brett Yoakum and Officer Jonathan Fletcher of the Southaven Police Department were dispatched to Rite Aid in response to Patel's call to law enforcement. Both officers filled out incident reports, and these statements appear in the record. In Officer Yoakum's incident report, he explained that he and Officer Fletcher responded to a dispatch regarding a man trying to present a *fraudulent* prescription at Rite Aid. Throughout his statement, Officer Yoakum repeatedly refers to Larry's prescription as "fraudulent" rather than forged. Officer Yoakum also noted that "Patel verified that the prescription was fraudulent." In Officer Fletcher's statement, however, he explained that he and Officer Yoakum responded to a dispatch regarding a *forged* prescription. Throughout his statement, Officer Fletcher refers to the prescription as forged rather than fraudulent.

¶25. The Pointers deposed Officer Yoakum in July 2019, more than three years after the incident at issue. During his deposition, Officer Yoakum testified that he spoke with Patel when he arrived at Rite Aid. Regarding that conversation, Officer Yoakum testified, "[F]rom

11

what I remember, I actually asked her, 'Did you talk to the doctor?' And she said yes. She said she talked to the doctor and that it was a fraudulent scrip." Officer Yoakum testified that if he had known that Dr. Patel had actually written the prescription for Larry, then the Pointers "would have been released, and there wouldn't have been any reason for [Patel] to call us." Officer Yoakum testified, however, that if Patel had brought to his attention the fact that the PMP showed that Larry possessed multiple controlled substance prescriptions, he would have "pass[ed] that information on to somebody at [Mississippi Bureau of Narcotics/Drug Enforcement Agency division] who can handle and is prepared to work those type of cases with doctors and pharmacists and things of that nature." Officer Yoakum explained that the Southaven Police Department is "not set up with that. A lot of that stuff is out of our jurisdiction."

¶26. The record also contains a "Pharmacist Statement" form provided by the police department and filled out by Patel. The record reflects that after the police officers were dispatched to the Rite Aid in response to Patel's call, the officers provided the Pharmacist Statement form to Patel and instructed her to fill it out. According to Officer Fletcher's incident report, Patel "informed [the] narcotics officers that the form would be filled out shortly." The officers then took the Pointers into custody and transported them to the police department. After the Pointers were released from custody, Officer Fletcher then returned to Rite Aid and retrieved the completed Pharmacist Statement form from Patel.

¶27. On the Pharmacist Statement form, Patel wrote that after checking the PMP regarding

12

Larry's history and after observing that his prescription was not written on tamper-resistant paper, she called Dr. Patel and verified that "the [prescription] was never written for [Larry] for any treatment." Patel wrote that she then called the police to inform them of the suspicious prescription. Patel ultimately concluded the form by writing that Larry's prescription did not meet Mississippi's requirements regarding a controlled substance prescription.

¶28. The Pointers take issue with Patel's statement on the form indicating that she verified that Larry's prescription was never written for any treatment. The Pointers argue that at the time Patel filled out the Pharmacist Statement form, she knew that Dr. Patel had in fact written Larry's prescription. The Pointers therefore claim that Patel knowingly made a false accusation.

¶29. Regarding Patel's statement on the form that she verified with Dr. Patel's office that Larry's prescription was never written for any treatment, Patel clarified in her deposition that Dr. Patel's office verified that Larry's prescription *was* for treatment. However, she explained she wrote that the prescription was never written for the patient for any treatment to indicate that Dr. Patel's office informed her that Larry's prescription was only to be filled at the pharmacy next door to Dr. Patel's office. On appeal, the Appellees further stress that though inartfully worded, Patel was ultimately trying to communicate on the Pharmacist Form that Larry's prescription did not meet Mississippi's requirements for a controlled

13

substance prescription.[6] Patel also testified in her deposition that her handwritten statement on the Pharmacist Statement form was not a detailed statement, and the form did not have enough space for her to write out all of the details.

¶30. Despite her inability to provide a full statement on the Pharmacist Form, Patel testified in her deposition that she informed the police officers that Dr. Patel's office confirmed that Dr. Patel wrote Larry's prescription. However, Patel informed the police officers that although Dr. Patel's office verified that he wrote the prescription, Dr. Patel's office asked her not to fill the prescription. Patel also clarified that based on the numerous red flags that arose while verifying Larry's prescription, she became suspicious that Larry's prescription was *fraudulent*, and not *forged*, and she reported the suspicious prescription to law enforcement. As stated, the police officers did not obtain the completed Pharmacist Statement form from Patel until after the officers had questioned the Pointers and released them from custody.

¶31. The record also contains a Mississippi PMP printout and a Tennessee PMP printout, both concerning Larry. These printouts reflect that in the forty days prior to presenting his prescription to Patel on May 19, 2016, Larry had obtained six prescriptions for the same controlled substance written by two different doctors, for a total of more than 300 opioid

---

[6] The record reflects that Patel immigrated to the United States from India in 2001. Patel testified that upon immigrating to the U.S., she had to take the Test of English as a Foreign Language (TOEFL).

14

pills.[7]

¶32.    In Dr. Patel's deposition, he admitted he was unaware that Larry went to four different pharmacies to fill the four prescriptions for controlled substances that Dr. Patel prescribed for Larry.  Dr. Patel explained that such an action raised a red flag that Larry was "doctor shopping and . . . probably getting prescriptions from many doctors."  Dr. Patel also admitted that he did not know that Larry was also being prescribed the same controlled substance by a different doctor.  Dr. Patel stated that if he had known any of this information, he would not have prescribed Larry the controlled substance.

¶33.    Based on our review of the record, we find that Patel's statements to law enforcement were made in good faith and based on a reasonable belief that Larry was guilty of possessing a fraudulent prescription.  *See Bester*, 963 So. 2d at 1192-93 (¶10).  As the trial court acknowledged, Patel had a duty pursuant to section 73-21-127 to "report any activity [she] reasonably suspects may be fraudulent or illegal to the appropriate law enforcement agency . . . and provide them with the relevant information obtained for further investigation."  Miss. Code Ann. § 73-21-127(c).  Section 73-21-127(g) also warns that pharmacists who fail to submit this information will be penalized.  Patel further testified that her decision to contact law enforcement to report the suspicious prescription was based on the totality of the red flags that arose while verifying Larry's prescription.

---

[7] This number includes the prescription for 30 pills presented on May 19, 2016, which is at issue in the present case.

¶34. Because we find that qualified privilege applied in this case, we must now "determine whether the privilege is overcome by malice, bad faith, or abuse." *Barmada*, 989 So. 2d at 364 (¶17) (quoting *Eckman v. Cooper Tire & Rubber Co.*, 893 So. 2d 1049, 1052 (¶9) (Miss. 2005)). "Where qualified privilege exists, a presumption of good faith arises." *Id*. The Pointers are required to "present affirmative evidence demonstrating actual malice to defeat the qualified privilege." *Id*. The supreme court has explained:

> Actual or express malice, as distinguished from malice in law, in its ordinary sense denotes ill will, a sentiment of hate or spite, especially when harbored by one person towards another, exists when one with a sedate, deliberate mind and formed design injures another, as where the person is actuated by ill will in what he does and says, with the design to willfully or wantonly injure another.

*Id*. (quoting *Young v. Jackson*, 572 So. 2d 378, 385 (Miss. 1990)).

¶35. On appeal, the Pointers argue that Patel did not act in good faith and that "she knowingly provided false information" to law enforcement. The Pointers assert that Patel admitted that she knew Dr. Patel wrote the prescription before she contacted the police. The Pointers therefore claim that "Patel had no reasonable grounds to believe that Mr. Pointer forged the prescription, yet she made that false allegation anyway."

¶36. However, as we discussed above, Patel consistently referred to the prescription as fraudulent, not forged. Patel admitted that she verified with Dr. Patel's office that he indeed wrote the prescription. During her deposition, Patel explained that based on the numerous red flags that arose while verifying Larry's prescription, including his controlled substance prescription history in the PMP, she became suspicious "that he may be overdosing or

16

abusing" the medications, and such suspicious action "needed to be notified to the authorities." The statements provided by the responding police officers referred to the investigation as one for a "forged prescription" and a "fraudulent prescription." However, Officer Yoakum testified in his deposition that Patel described Larry's prescription as "a fraudulent scrip."

¶37. After our review, we find that the Pointers failed to meet their burden of demonstrating any malice, bad faith, or abuse by Patel to defeat the qualified privilege. As stated above, actual malice "denotes ill will, a sentiment of hate or spite, especially when harbored by one person towards another," and actual malice exists "when one with a sedate, deliberate mind and formed design injures another." *Id.* at 364 (¶17) (quoting *Young*, 572 So. 2d at 385). Our review of the record reflects that Patel acted in good faith and in accordance with her duty as a pharmacist in reporting the suspicious prescription to law enforcement.

¶38. We also recognize that the Mississippi Supreme Court has held that statements made to "those with a direct interest in the subject matter" are subject to the qualified privilege. *Eckman*, 893 So. 2d at 1053 (¶10). However, "[a] qualified privilege does not protect a defamatory statement where there is excessive publication to persons not within the 'circle' of those people who have a legitimate and direct interest in the subject matter of the communication." *Id.* at (¶11).

¶39. In this case, the Appellees maintain that no excessive publication of any statement by

17

Patel occurred. Our review of the record reflects that Patel only made her statement to the police officers. We find that the police officers had a direct interest in whether Larry was attempting to fill a fraudulent prescription. Larry also testified in his deposition that other than the police officers, the only individuals who have any knowledge of Patel's statements are the persons the Pointers themselves told about the statements. We therefore find that Patel's statement was not excessively published to people outside of the circle of people who have a legitimate and direct interest in the subject matter.

¶40. We accordingly find that because Patel's statement to law enforcement was privileged, the trial court did not err in granting summary judgment on the Pointers' claim of defamation.

### B. Intentional Infliction of Emotional Distress

¶41. To prevail on their claim for intentional infliction of emotional distress, the Pointers must prove the following:

> [(1)] The defendant acted willfully or wantonly towards the plaintiff by committing certain described actions; [(2)] the defendant's acts are ones "which evoke outrage or revulsion in civilized society"; [(3)] the acts were directed at, or intended to cause harm to, the plaintiff; [(4)] the plaintiff "suffered severe emotional distress as a direct result of the acts of the defendant"; and [(5)] "such resulting emotional distress was foreseeable from the intentional acts of the defendant."

*Rainer*, 119 So. 3d at 403-04 (¶19) (quoting *J.R. ex rel. R.R. v. Malley*, 62 So. 3d 902, 906-07 (¶15) (Miss. 2011)); *see also Evans v. Miss. Dep't of Hum. Servs.*, 36 So. 3d 463, 475 (¶50) (Miss. Ct. App. 2010). We recognize that "Mississippi's standard for a claim of intentional infliction of emotional distress is very high, 'focusing specifically on the defendant's conduct

18

and not the plaintiff's emotional condition.'" *Orr v. Morgan*, 230 So. 3d 368, 376 (¶18) (Miss. Ct. App. 2017).

¶42. The Pointers argue that "[w]illfulness and wantonness connote knowingly and intentionally doing a thing or wrongful act." (Citing *Turner v. City of Ruleville*, 735 So. 2d 226, 229 (Miss. 1999)). The Pointers therefore assert that because Patel knowingly and intentionally provided false statements to the police, the willful and wanton requirement was satisfied. The Pointers also argue that calling the police and falsely accusing an individual of a crime evokes outrage or revulsion in a civilized society. The Pointers therefore maintain that Patel's conduct was sufficiently outrageous to support the tort of intentional infliction of emotional distress.

¶43. In *Orr*, 230 So. 3d at 371 (¶4), an employee of a store filed a complaint against her former employers alleging malicious prosecution, false arrest, false imprisonment, civil conspiracy, negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress following the employers' allegation that the employee stole an electronic device. In that case, the employers informed the police that the employee was the last person seen with the missing electronic device. *Id*. at (¶3). The employers also signed an affidavit against the employee for petit larceny. *Id*. The employee was arrested and charged with petit larceny. *Id*. However, the employee was later found not guilty of the charge. *Id*.

¶44. The employers filed a motion for summary judgment as to the employee's claims,

19

which the trial court granted. *Id*. at 371-72 (¶5). On appeal, this Court found no error in the trial court's grant of summary judgment as to the employee's claim of intentional infliction of emotional distress, explaining that "[w]hile the [employers] may have lacked probable cause and, thus, possibly acted with malice in charging [the employee] with petit larceny, the record does not support a finding that their actions would 'evoke outrage or revulsion in civilized society.'" *Id*. at 376 (¶18); *see also Rainer*, 119 So. 3d at 404 (¶19) (finding that because an employer had probable cause to initiate a criminal proceeding against an employee, the employer "did not act in such a way to evoke outrage or revulsion in civilized society"; therefore, summary judgment was proper); *Funderburk v. Johnson*, 935 So. 2d 1084, 1099-1100 (¶41) (Miss. Ct. App. 2006) (finding that because an employer had probable cause to initiate embezzlement charges against an employee, the employer's conduct "was not extreme, outrageous, or beyond all possible bounds of decency").

¶45.    As we stated above, our review of the record reveals that Patel acted in good faith when she called law enforcement to report Larry's suspicious and potentially fraudulent prescription. The record accordingly does not support a finding that Patel's actions would "evoke outrage or revulsion in civilized society." *See Rainer*, 119 So. 3d at 403-04 (¶19).

¶46.    Regarding damages, the Pointers asserted the following damages as a result of their claims: "personal injury to themselves and to their reputation . . . as they now have an arrest record which creates future derogatory opinions against them with law enforcement and other agencies in the future"; "mental anguish, anxiety and emotional distress as a result of the

20

humiliation from being handcuffed and arrested in public for a crime they did not commit"; "[Shirley's] sugar levels were elevated after the false arrest causing her doctor to increase her insulin." The Pointers asserted that these injuries "are continuing in nature, and [they] will continue to suffer such physical pain, mental anguish[,] and other damages and losses in the future."

¶47. However, in Officer Yoakum's deposition, he clarified that the Pointers were not arrested and that no arrest records exist for them. We further find that the Pointers failed to provide any evidence of damages to their reputation. As stated, Larry testified in his deposition that other than the police officers, the only individuals who have any knowledge of Patel's statements are the persons the Pointers themselves told about the statements.[8] Larry admitted that he and Shirley were at the police department for less than an hour, and he acknowledged that neither he nor Shirley were mistreated by the police during their detainment.

¶48. After our review, we find that the trial court did not err in granting summary judgment on the Pointers' claim for intentional infliction of emotional distress.

### C. Negligent Infliction of Emotional Distress/Negligence

¶49. We recognize that "[t]he tort of negligent infliction of emotional distress requires a plaintiff to plead and prove some sort of injury or demonstrable harm, whether it be physical

---

[8] Larry also testified that another woman was present at the pharmacy counter during the incident, but he stated that he did not know the lady.

21

or mental, and that harm must have been reasonably foreseeable to the defendant." *Orr*, 230 So. 3d at 377 (¶23) (internal quotation marks omitted). This Court has held that "[a]ny claim for negligent infliction of emotional distress based upon defamation would obviously require a successful claim of defamation." *Hudson v. Palmer*, 977 So. 2d 369, 385 (¶46) (Miss. Ct. App. 2007). As discussed above, the Pointers have "not met this prerequisite." *Id*.

¶50. To prevail on their claim of negligence, the Pointers "must establish by a preponderance of the evidence each of the elements of negligence: duty, breach, causation and injury." *Lee v. G & K Servs. Co.*, 98 So. 3d 489, 493 (¶12) (Miss. Ct. App. 2012) (citing *Paz v. Brush Engineered Materials Inc. (Paz I)*, 949 So. 2d 1, 3 (¶5) (Miss. 2007)). "The standard of care applicable in cases of alleged negligent conduct is whether the party charged with negligence acted as a reasonable and prudent person would have under the same or similar circumstances." *Johnson v. Goodson*, 267 So. 3d 774, 778-79 (¶15) (Miss. 2019).

¶51. The Pointers assert that when Patel received Larry's prescription, she had a duty to act as a reasonable and prudent person would under the circumstances. The Pointers argue that "[t]here can be little doubt that no reasonable or prudent person would knowingly provide false information about an alleged crime to the police." The Pointers submit that Patel breached her duty of care to the Pointers by falsely informing the police that Larry forged the prescription. As to their damages, the Pointers claim that "subjecting an innocent party to arrest and detention by the police is a humiliating, embarrassing, and unpleasant experience."

22

¶52. After our review, we find that the Pointers have failed to show the existence of a genuine issue of material fact as to whether Patel was negligent in making her statements to law enforcement. As stated, Patel had a duty pursuant to section 73-21-127 to report any suspicious prescriptions for controlled substances to law enforcement. The record also reflects that Patel received training from the K&B Mississippi Corporation related to the issue of screening prescriptions for controlled substances and reporting suspicious activity with controlled substances to law enforcement. One of the corporate representatives from K&B Mississippi Corporation also testified in his deposition that if a pharmacist feels that a prescription is suspicious, that pharmacist has an obligation to contact law enforcement.

¶53. After our review, we find no error in the trial court's grant of summary judgment on the Pointers' claims of negligent infliction of emotional distress and negligence.

¶54. Because the Pointers failed to show that a genuine issue of material fact exists, we affirm the trial court's judgment.

¶55. **AFFIRMED.**

**GREENLEE, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. BARNES, C.J., WILSON, P.J., WESTBROOKS, McDONALD AND McCARTY, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**